### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RUBEN VILLANUEVA-BAUTISTA | CRIMINAL ACTION<br>NO. 20-114 |

**PAPPERT, J.**                                                                                                    **February 10, 2022**

### MEMORANDUM

Ruben Villanueva-Bautista is charged with possession of a firearm and ammunition by an illegal alien in violation of 18 U.S.C. § 922(g)(5)(A). He moves to suppress all evidence, including the gun and bullets, found in a backpack in the car he was driving when stopped by police for running a red light. The Court held a suppression hearing on November 24, 2021 (ECF 51 and 54), received supplemental briefs (ECF 60 and 61) and denies Villanueva-Bautista's Motion for the following reasons.

I

On September 16, 2019 around 9:41 p.m., Villanueva-Bautista was driving a grey Infiniti sedan with Tennessee license plates north on Front Street in Philadelphia. (Nov. 24, 2021 Suppr. Hr'g Tr., ECF 54, 7:6-24.) Philadelphia Police Officer Henry Lesesane, who was driving, and Officer John Schanz, riding as the recording officer, watched the Infiniti run a steady red light at the intersection of Rising Sun Avenue and Rockland Street before turning right onto Roscomb Street. (*Id.*; see also *id.* at 49:22-50:2.) Officer Schanz described the area as having "very high-crime" with "a lot of gun violence, shootings, robberies, car jackings, thefts, a lot of stolen cars." (*Id.* at 8:14-16.)

At the time, Officer Schanz had been a Philadelphia police officer for "about two years" and Officer Lesesane had been with the Philadelphia police for approximately three years. (*Id.* at 6:15-18; 49:2-5.) Both officers testified credibly about all aspects of the traffic stop.

They activated their lights and siren and Villanueva-Bautista pulled over without incident. (*Id.* at 7:2-9; 9:3-16; 50:2-8; 50:21-22.) He was cooperative, was not moving in a way that would have been cause for concern and did not appear to be under the influence. (*Id.* at 35:6-12; 38:3-5.) However, he had no license, registration or insurance information. (*Id.* at 9:17-20.) He went through a book bag that had been on the floor behind the front seats looking for paperwork. (*Id.* at 10:19-23; 11:3-11.) Villanueva-Bautista ultimately handed Officer Schanz "a Hertz pamphlet book" with no rental contract or other indication of who owned the car. (*Id.* at 9:20-10:4.)

Officer Schanz asked Villanueva-Bautista his name and he said he was Michael Ruiz or Michael Ruiz Rodriguez and provided a birthdate. (*Id.* at 11:12-25.) A computer search, however, could not confirm the identification.[1] (*Id.* at 12:9-15; 52:2-11.) Because the Infiniti had Tennessee plates and Villanueva-Bautista could not provide any relevant paperwork or information, Schanz suspected it "possibly might be stolen." (*Id.* at 10:8-14.) Schanz asked Villanueva-Bautista whose car it was and he said it was his brother's. (*Id.* at 12:16-20.)

Neither Schanz nor Lesesane spoke Spanish and at all times talked to Villanueva-Bautista in English. (*Id.* at 27:22-28:2; 64:18-19.) Schanz testified that, although English was not Villanueva-Bautista's first language, he understood what the

---

[1] Whether Officer Schanz or Officer Lesesane ran the initial computer search is unclear.

2

officers said to him and responded appropriately in English. (*Id.* at 28:3-8; 36:22-23.) According to Officer Schanz, in circumstances like these, officers would "normally . . . call for a Spanish-speaking officer to speak to them [sic] in that language" in case it was "like a spelling issue or maybe like the numbers got mixed up, or whatever." (*Id.* at 36:19-37:1.)

Schanz testified that if he was unable to confirm a driver's identity, he also would "usually ask if they're licensed to carry, if there are any firearms in the car, any narcotics, anything along those lines." (*Id.* at 13:8-14.) He did not see or smell any marijuana but asked either "if there's any narcotics" or "if there was marijuana" in the car. (*Id.* at 13:14-17; 13:20-22; 14:1-6.) Villanueva-Bautista then "pulled out a jar – or like a tube, like a pill bottle containing alleged marijuana from that school bag" that Schanz had seen in the Infiniti. (*Id.* at 13:14-17.) According to Officer Lesesane, after the unsuccessful computer search for his identity, the officers "walked back up to the" Infiniti and asked Villanueva-Bautista "if he had any marijuana in the vehicle or anything like that." (*Id.* at 52:13-15.) Villanueva-Bautista then "reached into the back seat and reached into a red JanSport school bag and pulled out a little jar of marijuana." (*Id.* at 52:15-16.)

At that point, Lesesane said the officers asked Villanueva-Bautista" if he had anything else in the vehicle that we needed to be concerned with." (*Id.* at 53:2-3.) Villanueva-Bautista "stated no, and that [the officers] could search the vehicle," so they "asked him again as well if [they] could search in the vehicle, if anything else [wa]s inside the vehicle." (*Id.* at 53:3-6.) Officer Schanz could not remember if Villanueva-Bautista volunteered his consent to search the Infiniti or if he had been asked for

3

permission. (*Id.* at 17:25-18:9; 40:24-41:11; 44:24-45:3.) Villanueva-Bautista did not complete a form that would have been available to establish his consent in writing and Schanz did not recall telling him he had the option to decline consent. (*Id.* at 42:1-7; 42:22-43:2.)

After Villanueva-Bautista said the officers could search the Infiniti, they took him out of the car. (*Id.* at 53:6-8; *see also id.* at 16:21-17:1.) That is when Lesesane heard Villanueva-Bautista say it was his brother's car. (*Id.* at 58:17-18.) When Villanueva-Bautista stepped out of the Infiniti he "immediately turned around and put his hands behind his back . . . as though he was getting arrested." (*Id.* at 53:12-19; 54:13-15.) The officers did not handcuff Villanueva-Bautista but "patted him down for any weapons for officer safety and his safety as well," put him in the backseat of their patrol car and closed the door. (*Id.* at 17:10-18; 58:24-59:1.) According to Officer Lesesane, that is when the officers asked for the assistance of a Spanish speaking officer "just to have one present so [Villanueva-Bautista] understood fully . . . what was going on." (*Id.* at 59:2-3.)

There is no audio or video recording of the officers' interactions with Villanueva-Bautista up to that point. (*Id.* at 43:19-24.) Officer Lesesane's body camera was not working that night. (*Id.* at 61:8-11; *see also id.* at 17:2-9.) While Officer Schanz's body camera was operational, he did not activate it when they stopped Villanueva-Bautista. (*Id.* at 14:11-18.) As he explained it, after the officers put Villanueva-Bautista in the back of their car, Officer Schanz realized his camera "was blinking green," i.e., in standby, and not blinking red, which it would do when "actively recording audio and everything." (*Id.* at 14:24-15:21.) That is when he "immediately turned it on." (*Id.* at

4

16:16-17.)

While Lesesane went to search the Infiniti, Schanz again unsuccessfully ran through the computer the names and birthdate Villanueva-Bautista gave the police. (*Id.* at 17:19-24.) Perhaps "seconds" after returning to the Infiniti, Officer Lesesane came back saying he had recovered a gun from inside the JanSport backpack. (*Id.* at 18:25-19:6; 59:11-21.) He then placed Villanueva-Bautista in handcuffs. (*Id.* at 60:3-5.) The police still did not know who Villanueva-Bautista was so Lesesane remained with him to use a fingerprint scanner to try to confirm his identity while Officer Schanz returned to complete the search of the Infiniti. (*Id.* at 20:17-23; 60:10-14.) He explained their search included the backpack because Villanueva-Bautista had pulled the marijuana container from it. (*Id.* at 45:9-11.)

After Lesesane found the gun and Villanueva-Bautista had been handcuffed, Spanish-speaking Officers Josue Tirado and Juan Castro arrived at the scene. (*Id.* at 20:24-21:9.) Once on the scene, Tirado and Castro spoke to Villanueva-Bautista in Spanish. (*Id.* at 28:13-21.)

II

Police may temporarily "seize" a vehicle by pulling it over to investigate a traffic violation, as Officers Schanz and Lesesane did when Villanueva-Bautista ran a red light. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Villanueva-Bautista does not contend the traffic stop was unlawful, at least when it began. He argues Officers Schanz and Lesesane violated his Fourth Amendment right to be free from "unreasonable searches and seizures" because their actions exceeded the stop's permissible scope. He also claims he did not freely or voluntarily give consent to the

5

search of the car and, even if he did, the search exceeded the scope of any consent and otherwise lacked justification.

A

A stop that is lawful at its inception may become unreasonable if it is impermissibly extended. *United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018). (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). An investigatory traffic stop's appropriate length is determined by its "mission," i.e. addressing the traffic violation and attending to related safety concerns. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez*, 575 U.S. at 135). The point at which the officer does so is referred to as the "*Rodriguez* moment." *Id.*

A traffic stop's lawful mission may include inquiries about the driver's license, authority to operate the vehicle, travel plans and the vehicle's registration, proof of insurance and ownership. *See Rodriguez*, 575 U.S. at 354-55; *Garner*, 961 F.3d at 271. In addition, officers may determine whether the driver is subject to outstanding warrants. *Rodriguez*, 575 U.S. at 354. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355. "On-scene investigation into other crimes, however, detours from that mission." *Id.* at 356. It is difficult to pinpoint, however, "when tasks tied to a traffic stop are completed or reasonably should have been completed" and defining the *Rodriguez* moment can be elusive. *United States v.*

6

*Garner*, 961 F.3d 264, 270 (3d Cir. 2020).

The parties pinpoint the *Rodriguez* moment at two very different points in time. Villanueva-Bautista maintains his stop "had reached its reasonable conclusion" after the officers "conducted their database investigation and found no evidence that the car was stolen or wanted." (Def.'s Post-Hr'g Mem., ECF 60 at 9.) Although Officers Schanz and Lesesane were not able to confirm his identification, Villanueva-Bautista contends their extension of the stop after that moment was unreasonable because they "did not engage in any further inquiry about identity, driving privilege, residency, or the like . . . ." (*Id.*) Instead, they "engag[ed] in general criminal investigation and directly inquir[ed] about drugs and contraband in the vehicle," which, he argues, triggered the *Rodriguez* moment. (*Id.* at 9-10.)

The Government places the *Rodriguez* moment much later, contending the traffic stop "could not have been" completed when Villanueva-Bautista was asked about whether there was marijuana in the Infiniti. (Gov't Post-Hr'g. Mem., ECF 61 at 7.) It argues "the mission of the motor vehicle stop was far from over" given that the officers never learned who Villanueva-Bautista really was and whether he was authorized to drive the car. (*Id.*) Moreover, it contends the traffic stop had yet to reach its reasonable conclusion when the officers asked Villanueva-Bautista if there were any drugs or contraband in the car because the Spanish-speaking officers were not yet on site to obtain "better identification information from the [driver], which was clearly a function of the motor vehicle violation . . . ." (*Id.* at 9-10.)

In *Green*, the Third Circuit Court of Appeals took a "prudent" approach, "err[ed] on the side of caution and proceed[ed] on the assumption – not conclusion –" that the

7

officer was "no longer concerned with the moving violation" and the *Rodriguez* moment occurred when he sought information pertaining to drug trafficking. 897 F.3d at 182. The Court will do the same thing here and assume that the *Rodriguez* moment occurred when the officers returned to the Infiniti and asked Villanueva-Bautista whether he had any drugs.

B

Officers must have an "objectively reasonable and articulable suspicion" of illegal activity to extend a traffic stop past the *Rodriguez* moment. *Garner*, 961 F.3d at 271 (citing *Rodriguez*, 575 U.S. at 355). They may prolong a stop to detect "evidence of ordinary criminal wrongdoing" only if they have the "reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 555.

Reasonable suspicion turns on "probabilities," not "hard certainties." *United States v. Mathurin*, 561 F.3d 170, 174 (3d Cir. 2009) (quoting *United States v. Cortez*, 449 U.S. 411, 412 (1981)). The officers must have had "more than a hunch," but need not have had "proof of wrongdoing by a preponderance of the evidence." *Garner*, 961 F.3d at 271 (internal quotations omitted) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968) and *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The Court considers "the totality of the circumstances – the whole picture." *Garner*, 961 F.3d at 271 (quoting *Cortez*, 449 U.S. at 417). This includes recognizing "the particular ability of law enforcement officers, based on training and experience, 'to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Green*, 897 F.3d 173, 183 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *see also United States v. Torres*, 961 F.3d 618, 623 (3d Cir. 2020) ("We afford

significant deference to a law enforcement officer's determination of reasonable suspicion."). A "divide-and-conquer" analysis offering a "plausible innocent explanation" for "each arguably suspicious factor . . . in isolation" is not appropriate. *Green*, 897 F.3d at 183 (citing *District of Columbia v. Wesby*, --- U.S. ----, 138 S. Ct. 577, 589 (2018)).) "The ultimate question is whether a reasonable, trained officer standing in [Schanz and Lesesane's] shoes could articulate specific reasons justifying [Villanueva-Bautista's] detention" for reasons beyond the traffic violation. *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003).

Officers Schanz and Lesesane had an objectively reasonable suspicion that Villanueva-Bautista was engaged in illegal activity when they asked if he had drugs in the car. He ran a red light in a high crime area. He was driving a car with a license plate from a state a long way from Philadelphia. He had nothing to show that he owned the car or was permitted to drive it; he produced a Hertz rental pamphlet, but no rental contract or other rental documents. He had no proof of insurance or registration information. He had no driver's license or other proof of identification. The name and birthdate he gave the police could not be confirmed. All of this, combined with the informed assessments Officers Schanz and Lesesane made based on their training and experience, gave them reasonable suspicion that Villanueva-Bautista was up to no good and allowed them to expand the scope of their inquiry beyond the traffic violation.

C

When the officers asked Villanueva-Bautista if he had drugs, he produced less

than thirty grams[2] of marijuana (Hr'g Tr., at 38:17-19), prompting the search that led to the discovery of the firearm.  He argues he did not voluntarily consent to the search (Def's Mot. to Suppress, ECF 42, at 6-7.)  A search "conducted pursuant to consent" is "one of the specifically established exceptions to the requirements of both a warrant and probable cause . . . ."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 19 (1973).  To justify a consent-based search, the Government "has the burden of proving the consent was, in fact, freely and voluntarily given."  *United States v. Price*, 558 F.3d 270, 277-78 (3d Cir. 2009) (citation omitted).

The Court must consider the totality of the circumstances when determining whether Villanueva-Bautista's consent was his "essentially free and unconstrained choice."  *Schneckloth*, 412 U.S. at 225-26.  Relevant factors include:  "the parties' verbal and non-verbal actions"; Villanueva-Bautista's "age, education, and intelligence"; whether he was advised of his constitutional rights; the number of officers present; the encounter's length, location and time; the duration of questioning and any repetition; and whether physical punishment was used.  *Price*, 558 F.3d at 278; *see also United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003).

Villanueva-Bautista argues he was "an 18 year-old recent immigrant from the Dominican Republic with a grade school education who had difficulty understanding English . . . ."  (Def's Mot. to Suppress, ECF 42, at 7.)  He asserts he did not know he had a choice when he was "faced with two armed and uniformed police officers asking him for consent at night on the side of the road by himself" and the officers did not let

---

[2]  For that quantity, the officers would have issued a ticket for a $25 fine.  (Hr'g Tr., ECF 54 at 38:20-39:6.)  *See also* 35 Pa. Stat. § 780-113(a)(31) (defining thirty grams as a "small amount of marihuana").

10

him know he was free to decline their request and would be able to leave if he did not consent to a search. (*Id.*) He also suggests Officer Schanz intentionally failed to activate his body camera until after he gave his alleged consent "to obscure unlawful police action." (Def.'s Post-Hr'g Mem., ECF 60 at 4.) The Government counters, based on the officers' credible testimony, that Villanueva-Bautista's consent was voluntary and not the product of coercive police conduct. (Gov't Resp., at 11-12.)

Any questions raised by the belated activation of Schanz's body camera are outweighed by his and Lesesane's credible testimony about their interactions with Villanueva-Bautista. Even though they sought Spanish-speaking assistance to facilitate his identification, the officers believably explained that Villanueva-Bautista understood what they said to him. He attempted to comply with their request for appropriate paperwork when he was stopped and then responsively and voluntarily produced the container of marijuana when asked if he had any narcotics. Nothing about his responses to the officers' inquiries suggests he did not understand them, and the officers had no doubt he did.

Nor is there credible evidence of coercion. Officer Lesesane testified that Villanueva-Bautista gave them permission to search the Infiniti after he turned over the marijuana from the JanSport bag. (Hr'g Tr. at 53:3-8; 57:4-13.) Villanueva-Bautista was handcuffed only after he was unable or unwilling to identify himself or prove he was authorized to drive the car and the officers found the gun. Villanueva-Bautista does not contend he resisted the handcuffs or that either officer used force or made threats to obtain his consent.

In addition, the "consent inquiry does not require officers to inform citizens of

11

their right not to cooperate when seeking permission to conduct a warrantless consent search." *United States v. Crandell*, 554 F.3d 79, 88 (3d Cir. 2009) (citation and internal quotations omitted). "The individual's knowledge of h[is] right to refuse consent is only one factor in the totality of the circumstances inquiry." *United States v. Velasquez*, 885 F.2d 1076, 1082 (3d Cir. 1989). Considering the whole picture, the Government has carried its burden of showing Villanueva-Bautista voluntarily allowed the officers to search the car.

### D

Finally, Villanueva-Bautista maintains that even if his consent was voluntary, their search of his backpack and the vehicle exceeded the scope of his consent and otherwise lacked justification. (Def's Mot. to Suppress, at 7.) When a warrantless search is authorized by voluntary consent, the scope of the search is limited to the consent's terms. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Objective reasonableness is the standard for measuring the scope of consent, that is, "what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Id.* at 251.

As the Government argues, Villanueva-Bautista knew of the officers' interest in locating marijuana in the Infiniti and "he would certainly have contemplated their searching the JanSport bag, as this was the location from which he had produced the initial quantity of marijuana, in full view of the officers." (Gov't Resp., ECF 44, at 16.) There is no evidence he withdrew his consent to the search. *See United States v. Williams*, 898 F.3d 323, 331 (3d Cir. 2018) ("Once . . . a suspect has voluntarily consented to a search, it is his burden to demonstrate that he has withdrawn that

consent by pointing to an act or statement that an objective viewer would understand as an expression of his desire to no longer be searched."). Moreover, based on the testimony at the suppression hearing, the search was reasonable and expeditious. *See United States v. Comegys*, 504 F. App'x 137, 142 (3d Cir. 2012) (holding a three-hour traffic stop and vehicle search fell within the scope of consent).

Because there was no Fourth Amendment violation, there is no basis for suppression. *See United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014) (en banc), ("To deter Fourth Amendment violations, when the Government seeks to admit evidence collected pursuant to an illegal search or seizure, the judicially created doctrine known as the exclusionary rule at times suppresses that evidence and makes it unavailable at trial."), cert. denied, 574 U.S. 1177 (2015) (citing *Herring v. United States*, 555 U.S. 135, 139 (2009)).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.